## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

-------------------------------------------------------

| | | |
|---|---|---|
| NATHAN BARNS, SUSANNAH | ) | |
| KILPATRICK, and DARREN | ) | |
| KILPATRICK, | ) | COMPLAINT |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE PAYNE and | ) | |
| PATRICIA PAYNE, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

-------------------------------------------------------

### COMPLAINT AND JURY DEMAND

Plaintiffs Nathan Barns, Susannah Kilpatrick and Darren Kilpatrick, for their Complaint against Defendants Lawrence Payne and Patricia Payne, state and allege as follows:

### Parties and Jurisdiction

1.      At all times relevant hereto, Plaintiff Nathan Barns was a resident of Tulsa, Oklahoma, and is a citizen of Oklahoma.

2.      At all times relevant hereto, Plaintiffs Susannah Kilpatrick and Darren Kilpatrick were residents of Muskogee, Oklahoma, and are citizens of Oklahoma.

177829838

3.      Defendants Lawrence Payne and Patricia Payne reside in Overland Park, Kansas, and are citizens of Kansas.

4.      This Court has jurisdiction pursuant to 28 U.S.C § 1332. There is complete diversity of the parties and the amount in controversy is greater than $75,000.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because both defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

<u>**Factual Allegations**</u>

*Plaintiffs*

6.      Mr. Barns is a Certified Financial Planner (CFP) and has worked at Edward Jones since May 2008 as a Financial Advisor.

7.      Mr. Kilpatrick is the Vice President of Charlie's Chicken franchise, which has 28 units in Oklahoma, and owns restaurants in Pryor, Oklahoma and his hometown of Muskogee.

8.      Ms. Kilpatrick owned a wedding venue from 2008 until May of 2020, when she sold the business. She currently works side by side with her husband Mr. Kilpatrick in the accounting and management of their restaurant businesses.  Together they have four children ages 25, 22, 17, and 16.

*Defendants*

9.      Lawrence Payne resides at 16121 Earnshaw St. Overland Park, Kansas 66221.

10.     Patricia Payne is Mr. Payne's wife and business partner.

11.     Defendants began their fitness careers as personal trainers and body builders, with Defendant Lawrence Payne earning the Bodybuilding Lightweight World Champion title in 2011.

1

177829838

12.     On or about July 2013, Defendants were charged with forgery and insurance fraud in the District Court of Johnson County, Kansas. Defendant Lawrence Payne was found guilty on the insurance fraud charge and on December 6, 2016 he was sentenced to jail for one year and six months.  Defendant Lawrence Payne failed to disclose this material information to Plaintiffs at the time he subsequently solicited their investments that are the subject of this Complaint.

13.     On or about September 2018, Defendant Lawrence Payne was charged in this Court with violation of the Endangered Species Act, Title 16, United States Code, Section 1533, for unlawfully importing a leopard cat. Defendant Lawrence Payne pled guilty to the charge on October 3, 2018.  Defendant Lawrence Payne failed to disclose this information to Plaintiffs at the time he solicited their investments.

14.     In 2016, Defendants founded Hardbody Supplements LLC (the "Company"), a dietary supplement company which purports to offer an array of protein powders, pre-workout mixes and fitness and weight loss plans.

15.     The Company purportedly manufactures its products at "Canadian Supplements" in Canada and sells the products on its online store through Shopify and Amazon.

16.     On October 10, 2016, Hardbody Supplements LLC's Articles of Organization were filed with the Kansas Secretary of State.

17.     On October 21, 2016 Defendants executed the Hardbody Supplements LLC Operating Agreement ("2016 Operating Agreement") providing that each would own 50% of the Units of the Company, which entitles each of them to 50% interest in the company pursuant to Article 1 (b) of the Operating Agreement.

18.     In early 2019, Defendant Lawrence Payne solicited Mr. Barns to buy 20% of the Company.  Mr. Barns declined.

2

19.     Defendant Lawrence Payne subsequently offered to sell 40% of the Company to Mr. Barns.  Mr. Barns rejected the offer and informed Defendant Lawrence Payne that he would not purchase less than a 50% stake and equal partnership in the Company to protect his investment.

20.     Mr. Barns and Defendant Lawrence Payne negotiated for several months. In the course of the negotiations, Mr. Barns analyzed the Company's financial statements and took a due diligence trip to see its operations and meet with its Canadian supplier.  Defendant Lawrence Payne represented to Mr. Barns that the financial statements were true and correct.

21.     Defendants ultimately offered to sell 50% of the Company to Plaintiffs.

### *Plaintiffs Become Members of Hardbody Supplements LLC*

22.     Relying upon Defendants' financial statements and representations of the operations, revenues, liabilities and expenses of the Company, Plaintiffs agreed to purchase a 50% stake in the Company.

23.     On April 6, 2019, Plaintiffs entered into an Equity Interest Purchase Agreement ("Purchase Agreement") with Defendants, whereby Defendants agreed to sell and Plaintiffs agreed to purchase a "non-dilutable 50% of all seller's issued and outstanding equity interest of the Company (the 'Units')" for $500,000 payable in installments.

24.     Plaintiffs fully performed their obligations under the Purchase Agreement, paying in four installments.

25.     Pursuant to the Purchase Agreement, Defendants sold Plaintiffs 50% of Defendants' ownership interest in the Company as follows:

> Nathan D. Barns –25%
> Susannah Kilpatrick –12.5%
> Darren Kilpatrick –12.5%

177829838

26.     The 2016 Operating Agreement provides the following definitions:

"Membership Interest" means the entire ownership interest of a Member in the Company at any particular time, including the right to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Kansas Revised Limited Liability Company Act, together with the obligations of the Member to comply with all of the terms and provisions of this Agreement.

"Ownership Interest" means the Percentage interest or **Units**, as applicable, based on the manner in which relative ownership of the Company is divided.

"Percentage Interest" means the percentage of ownership in the Company that, with respect to each Member, entitles the Member to a Membership Interest and is expressed as either:

A. If ownership in the Company is expressed in terms of percentage, the percentage set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement; or,

B. **If ownership in the Company is expressed in Units,** the ratio, expressed as a percentage of:

(1)     The number of Units owned by the Member (expressed in "MU" in the equation below) divided by
(2)     The total number of Units owned by all of the Members of the Company (expressed as "TU" in the equation below)

Percentage interest = MU/TU

**"Units" mean**, if ownership in the Company is expressed in Units, units of ownership in the Company, that, with respect to each Member, **entitles the Member to a Membership Interest** which, if applicable, is expressed as the number of Units set forth opposite the name of each Member on Exhibit A, as may be adjusted from time to time pursuant to this Agreement.

27.     The equity interest sold and purchased under the Purchase Agreement was

identified as "Units" of the Company.  Based on the foregoing, as defined in the 2016 Operating

4

Agreement, ownership of the Company expressed in Units entitles the Member to a Membership Interest.

28.     Accordingly, pursuant to the Purchase Agreement and the 2016 Operating Agreement, upon purchasing "non-dilutable 50% of all seller's issued and outstanding equity interest of the Company (the 'Units')" Plaintiffs became members of the Company, collectively holding 50% Membership Interest.

29.     On or about May 6, 2020, Plaintiffs and Defendants drafted a new Company Operating Agreement ("2020 Operating Agreement") in order to create new classes of Units for outside investors and fundraisers.

30.     The 2020 Operating Agreement defines a new class of units for fundraisers and others and is otherwise materially identical to the 2016 Operating Agreement.

31.     The 2020 Operating Agreement's ownership schedule reflects the existing Membership Interests of Plaintiffs and Defendants, recharacterized as a "A-Class" voting interests. Exhibit A of the 2020 Operating Agreement, entitled "Members," reflects that Plaintiffs collectively own 50% of the voting "A-Class" Membership Interests in the Company and Defendants own the remaining 50%.

32.     Pursuant to the new 2020 Operating Agreement, a new "Class-C" of shares was created. Brett Malinowski owned 0.3% Class-C shares, and Curtis Rice owned 0.25% Class-C shares. The new ownership and percentage interest was detailed as follows:

> Lawrence & Patricia Payne 49.725% -A
> Nathan Barns 24.8625% -A
> Darren Kilpatrick 12.43125% -A
> Susannah Kilpatrick 12.43125% -A
> Brett Malinowski 0.3% -C
> Curtis Rice 0.25% -C

177829838

33.     The Members confirmed the membership interests detailed in the May 6, 2020

Operating Agreement in various e-mail communications from May 7 to May 17, 2020.

### *Plaintiffs' Rights as Members of the Company*

34.      According to the 2016 and 2020 Operating Agreements (together the "Operating

Agreements") the Company is member-managed:

> Subject to the terms of this agreement and the Kansas
> Revised Limited Liability Company Act, the business and
> affairs of the Company will be managed by the Members.
>
> Approval and Action. Unless greater or other authorization
> is required pursuant to this Agreement or under the Kansas
> Limited Liability Company Act for the Company to
> engage in an activity or transaction, **all activities or
> transactions must be approved by the Members, to
> constitute the act of the Company or to serve to bind
> the Company.** With such approval, the signature of any
> Members authorized to sign on behalf of the Company is
> sufficient to bind the Company with respect to the matter
> or matters so approved. **Without such approval, no
> Members acting alone may bind the company to any
> agreement with or obligation to any third party or
> represent or claim to have the ability to so bind the
> Company.**

Operating Agreements Articles 4 § 4.1A and 4.1B

35.     Plaintiffs have owned a "non-dilutable" 50% of the voting interests in the Company

since signing the Purchase Agreement in April 2019. Their approval or delegation is therefore

necessary to take virtually any action, including any distribution, capital investment, sale of

Membership Interests or Company assets, or debt.

36.     The Operating Agreement additionally grants individual Members, including

Plaintiffs, numerous rights and powers, including the right to access and inspect the Company

accounts and records (Article 5 of the Operating Agreement) and the right to call a Meeting of

Members (Article 6 §6.2 of the Operating Agreement).

6

37.     From 2019 through November 2020, Mr. Barns was in regular communication with Defendant Lawrence Payne regarding the operations, capital raising efforts and significant business decisions.

38.     Plaintiffs and Defendants had also agreed that all financial statements, including Company credit card and bank statements, would be shared via DropBox so that all Members could access and review them on roughly equal footing.

39.     Defendants were provided incomplete or inaccurate financial and sales information until November 2020.

***Defendants' Unilateral Withdrawals of Capital and Misappropriation of Company Funds***

40.     In blatant breach of the Operating Agreements and Purchase Agreements, Defendants have caused the Company to conduct business, make expenditures, enter agreements, take on debt, and make distributions without approval of the Members.

41.     In 2019, Defendants unilaterally distributed more than $500,000 to themselves without approval of Plaintiffs, pro rata distribution to Plaintiffs, or adjustments to tax and capital accounts.

42.     In the first quarter of 2020, Defendants unilaterally distributed at least $1.5 million to themselves without approval of Plaintiffs, pro rata distribution to Plaintiffs, or adjustments to tax and capital accounts.

43.     Defendants' self-dealing distributions of Company assets were made without prior approval of any of the Plaintiffs in breach of Sections 4.1 and 6.1 of the Operating Agreements.

44.     Defendants' self-dealing distributions of Company assets further breached Section 3.2 of the Operating Agreements, which requires distributions of cash and property to the Members "on a pro rata basis in proportion to the respective Percentage Interest held by each Member."

177829838

45.     Defendants also used Company assets as a slush fund to buy themselves expensive toys, including an exotic car for Defendant Lawrence Payne.

46.     Defendants failed to properly record distributions and personal expenses against their capital accounts for tax or accounting purposes in breach of Sections 2.4, 3.1 and 3.2 of the Operating Agreements and tax and accounting rules.

### Defendants' Retaliation Against Plaintiffs in Breach of the Operating Agreements

47.     Plaintiffs repeatedly objected to Defendants' misappropriation of Company assets, demanded proper accounting and asserted their rights as Members to inspect Company books and records, approve all distributions and expenditures, and take distributions pro rata.

48.     Immediately after Plaintiffs learned of Defendant Lawrence Payne's exotic car purchase using company funds, Plaintiffs' counsel made a written demand, dated November 12, 2020, for inspection of the Company's books and records.

49.     On or around November 15, 2020, immediately after Plaintiffs strenuously objected to Defendants' misappropriation of Company assets and demanded the inspection of the Company's books and records, Defendants cut off Plaintiff's access to financial statements and sales data in breach of Article 5 of the Operating Agreements.

50.     Plaintiffs renewed their demand for inspection, that Defendants immediately cease misappropriating Company assets and that Defendants restore access to financial statements and sales data.  Defendants refused.

51.     Defendants subsequently claimed, for the first time, that the Purchase Agreement sold an unidentified "passive," non-member interest, entitling Plaintiffs to neither rights as Members under the Operating Agreements or any share of distributions, rather than the "50% of all Sellers' issued and outstanding equity interest" stated on the face of the Purchase Agreement.

177829838

52.     This claim is contrary to and materially breaches the plain language of the Purchase Agreement and Operating Agreements and Defendants' representations and warranties to Plaintiffs.

53.     Defendants' assertion that they sold Plaintiffs "passive" non-member interests rather than "50% of all the Sellers' issued and outstanding equity interest of the Company (the "Units")" is in breach of the Operating Agreement, which expressly requires the delivery of Percentage Interests to persons whose ownership in the company is expressed in "Units." (Article 1 "Percentage Interest" §B).  Pursuant to the Purchase Agreement, Plaintiffs purchased 50% of Sellers's Units, meaning Defendants were required to deliver to Plaintiffs 50% percentage interest in the Company under the Operating Agreement.

54.     Further, there is no provision for "passive" non-member interests in the Operating Agreements, there is no evidence that the Company issued "passive," non-member interests in the form of "passive," non-member Units prior to the Purchase Agreement, and there is no reference to the sale of "passive," non-member Units in the Purchase Agreement. Defendants also provided no explanation for the failure to make pro rata distributions, to which even "passive" investors would have a clear entitlement.

55.     The Purchase Agreement expressly provides that Defendants agreed to the sale of "50% of all the Sellers' issued and outstanding equity interest of the Company (the 'Units')." Plaintiffs purchased 50% of the Units of the Company, based on representations that they were purchasing 50% membership interest in the Company. Defendants' assertion that they secretly sold unidentified "passive" interests rather than 50% of all their "outstanding equity interest[s]" would, if true, constitute a clear admission of fraud.

9

56.     Defendants subsequently locked Plaintiffs out of the Company, withheld all information regarding its operations, activities, financials, and distributions, and, upon information and belief, escalated their misappropriation of Company assets, in ongoing breach of Articles 3, 4, 5 and 6 of the Operating Agreements.

### *Ongoing Breach and Company Deadlock*

57.     On May 17, 2022, Plaintiffs gave written notice of a Meeting of Members pursuant to Section 6.2 of the Operating Agreements, to be held via Zoom on May 31, 2022. The purpose of the Meeting was to address the misappropriation, books and records, and management issues, and Defendants reiterated that no further action, including specifically further distributions, transfers of assets, or incurrence of debt, could be undertaken without a Meeting of Members and due authorization pursuant to the Operating Agreements:

> As you are aware, Lawrence Payne and Patricia Payne have unlawfully excluded Mr. Barns, Ms. Kilpatrick and Mr. Kilpatrick from management of the Company, in violation of Articles 4 and 6 of the Operating Agreement, and deprived them of their rights as Members, including but not limited to their right to distributions in violation of Article 3.  They have concealed material information regarding the finances and operations of the Company in violation of Article 5.  They have misappropriated Company assets and otherwise engaged in self-dealing, including by taking distributions or "draws" without authorization in violation of Sections 3.2, 4.1 and 6.1, proper capital accounting in violation of Sections 2.4, 3.1 and 3.2, or pro rata distribution to all Members in violation of Section 3.2.  They have taken numerous acts without authorization in violation of Articles 4 and 6, including acts that breached their fiduciary duties by knowingly exposing the Company to liability under the False Claims Act and Internal Revenue Code.

> This conduct clearly violates the Operating Agreement, impairs the rights and property of the Members, and threatens the Company's business, assets, and future viability.  It must cease immediately.  Without limitation, the purpose of the Meeting of Members is to review, and take measures to remediate, this conduct, current finances and operations of the Company, potential exposure to third-parties, potential legal action against Lawrence Payne and Patricia Payne, and the future management and operations of the Company.  Given the seriousness of these issues and likelihood that they will cause irreparable injury to the Company unless they are immediately resolved, your clients' refusal or failure to attend the Meeting, or to make the Company's complete and current books and records available for

177829838

inspection by May 31, 2022 in order to facilitate the Meeting, will result in immediate legal action to protect the Company and the rights of its Members, including, if necessary, a petition of dissolution under Section 8.1(ii) and K.S.A. § 17-76,117.

58.    Plaintiffs also demanded indemnification and advancement of costs and attorneys' fees pursuant to Sections 9.1 and 9.3 of the Operating Agreement and indemnification pursuant to Section 6 of the Purchase Agreement.

59.    The Notice and Demand was sent via electronic mail to Defendants' counsel and via certified mail to Defendants' home in Overland Park, Kansas.

60.    By response letter dated May 26, 2022, Defendants again claimed that Plaintiffs are not Members of the Company and hold only still-unidentified "passive or silent" interests in the Company:

> My clients thought they were selling equity in the Company that made your clients passive or silent investors in exchange for your clients' investment ($500,000) and a commitment from Nathan D. Barns to raise capital for the Company.

Kincaid Letter May 26, 2022 pg.4

61.    By the same letter, Defendants again refused to provide Plaintiffs access to the Company books and records, instead tentatively offering to sit down with Plaintiffs and go through financial statements curated by Defendants on the condition that they "are not inviting attorneys or other advocates or advisors to this meeting."

62.    On May 31, 2022, after repeated notice, Defendants, through counsel, informed Plaintiffs that they would not be attending the Meeting of Members scheduled for that day. Consequently, Members holding only 50% of Membership Interests were unable to take any action.

177829838

63.     Plaintiffs subsequently sought repeatedly to obtain inspection of books and records. Defendants refused.

64.     Plaintiffs also repeatedly sought Defendants' availability for a Meeting of Members to address the issues set forth above and reiterated that without a Meeting the Company would require dissolution.

65.     On July 8, 2022, Plaintiffs noticed a second Meeting of Members for July 25, 2022 via Zoom, a date on which Defendants had indicated general availability.

66.     On July 14, 2022, Defendants' new counsel notified Plaintiffs that he had been retained and indicated that Defendants were prepared to work toward a resolution.

67.      Between July 14 and July 26, Plaintiffs' and Defendants' attorneys attempted to schedule a phone call to discuss a resolution to the Company's deadlock. After a number of unsuccessful attempts to reach Defendants' attorney, a phone call was finally scheduled for July 26, 2022. During the call, Plaintiffs' attorney again demanded access to the Company's books and records.

68.     Defendants failed to appear at the Meeting of Members on July 25, 2022.

69.     Between July 26 and August 15, 2022, Plaintiffs' attorney made numerous attempts to schedule a phone call with Defendants' attorney, and each time they were met with delays and excuses.

70.     On August 15, 2022, after three weeks of unreturned calls, Defendants' attorney informed Plaintiffs' attorney that Defendants were not going to grant Plaintiffs access to the Company books and records.

71.     As set forth in the paragraphs above, Defendants, holding only 50% ownership of the Company insufficient to authorize any act under the Operating Agreements, have repeatedly

prevented Plaintiffs from accessing Company books and records and repeatedly refused to attend

Meetings of Members while conducting Company business, and engaging in significant corporate

acts, including substantial unilateral distributions of Company assets, without authorization in

blatant violation of the Operating Agreement.

72.     Article 6 §6.1 and §6.2 of the Operating Agreements expressly states the voting

rights and requirements of Members as follows:

> Members and Voting Rights. The Members have the right
> and power to vote on all matters to which the Articles of
> Organization, This Agreement, or the Kansas Revised
> LLC Act requires or permits. Unless otherwise stated in
> this Agreement (for example, in Section 4.1 (c)) or
> required under the Kansas Revised LLC Act, **the vote of
> the Members holding at least a majority of the Voting
> Interest of the Company is required to approve or
> carry out an action.**
>
> Meetings of Members. Annual, regular or special meetings
> of the Members are not required but may be held at such
> time and place as the Members seem necessary or desirable
> for the reasonable management of the Company. A written
> notice setting forth the date, time, and location of a
> meeting must be sent at least ten (10) days but no more
> than sixty (60) days before the date of the meeting to each
> Member entitled to vote at the meeting. […] Any action
> that could be taken at a meeting may be approved by a
> consent in writing that describes the action to be taken and
> is signed by Members holding at minimum Voting
> Interests required to approve the action. If any action is
> taken without a meeting and without unanimous written
> consent of the Members, notice of such action must be sent
> to each Member that did not consent to the action.

73.     Without authorization, either by written consent or a vote duly taken and recorded

at a Meeting of the Members, the Company is unable to take any significant action, including to

address the misappropriation of Company assets.

177829838

74.     Given the repeated refusal of Defendants to attend Meetings of the Members, the Company is deadlocked and a requisite vote for action cannot be obtained with respect to the management of the Company's affairs.  Dissolution is therefore appropriate under Section 8.1(ii) of the Operating Agreement and K.S.A. § 17-76, 117.

***Defendants continue to make unauthorized draws and engage in exorbitant expenditures of Company funds***

75.     Between December 2020 and the date of this filing, Defendants have made public statements regarding the Company's revenues.

76.     In the publication Inc., for example, Defendants represented that the Company had "$25.6 million" in revenue in 2020 alone.

77.     On May 13, 2022, Defendant Lawrence Payne posted on his Instagram account that the Company was ranked second in the 2022 Inc. Mid-West regional awards and represented that the Company earns "9 figures yearly."

78.     During the same period, Defendant Lawrence Payne has purchased numerous exotic cars, including McLarens and Lamborghinis, as he has recorded on his Instagram account.

79.     During the same period, Defendant Lawrence Payne has posted information about his numerous lavish purchases on his Social Media accounts, including jewelry and diamonds.

80.     During the same period, Defendant Lawrence Payne has purchased numerous Non-Fungible Tokens ("NFTs"), as shown on his Opensea.io account page.  These include at least one Bored Ape Yacht Club NFT, which he purchased on December 19, 2021 for approximately $192,500, approximately 25 Mutant Ape Yacht Club NFTs, each of which was valued at approximately $121,000, and approximately 30 Clone X – X Takashi Murakami NFTs, each of which was valued at approximately $53,000.

177829838

81.     Upon information and belief, Defendant Lawrence Payne funded these purchases in part or entirely through misappropriation of Company assets.

82.     During the same period, the Company made no distributions to Plaintiffs and disclosed no financial or other performance information, in breach of the Operating Agreements.

83.     Without immediate judicial intervention, Defendants have clearly communicated that they will continue to unilaterally operate the Company to their exclusive benefit in breach of the Operating Agreements and waste Company assets.

## CAUSES OF ACTION

### Count I
### Breach of Contract

84.     The allegations set forth in this Complaint are repeated and realleged as though fully set forth herein.

85.     In Kansas, the elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach. *All. Platforms, Inc. v. Behrens*, 49 Kan. App. 2d 53, 305 P.3d 30 (2013)

86.     The Purchase Agreement and Operating Agreements constitute valid contracts between and among Plaintiffs and Defendants and are supported by sufficient consideration in the amount of $500,000.

87.     At all times relevant hereto, Plaintiffs performed in compliance with the Operating Agreements.

88.     Defendants breached and continue to breach the Purchase Agreement and Operating Agreements by, without limitation:

177829838

    a.   Conducting Company business and taking numerous corporate acts without authorization of a majority of the Members in breach of Articles 4 and 6 of the Operating Agreements;

    b.   Preventing Plaintiffs from accessing Company books and records and concealing material information in breach of Article 5 of the Operating Agreement;

    c.   Taking unauthorized distributions in violation of Sections 3.1, 4.1, and 6.1 of the Operating Agreements;

    d.   Failing to make pro rata distributions to all Members in violation of Section 3.2 of the Operating Agreements;

    e.   Failing to keep proper capital accounts in violation of Sections 2.4, 3.1 and 3.2 of the Operating Agreements;

    f.   Locking Plaintiffs out of the management of the Company and supervision of its finances in breach of every provision of the Operating Agreements and the Purchase Agreement; and

    g.   Failing to indemnify and advanced attorneys' fees and costs pursuant to Article 9 of the Operating Agreements and Section 6 of the Purchase Agreement.

89.    As a result of Defendants' breach, Plaintiffs have incurred damages in an amount to be proven at trial.

90.    Pursuant to Section 6 of the Purchase Agreement, Plaintiffs are entitled to recover from Defendants all costs and expenses, including reasonable attorney fees and court costs, attributable directly or indirectly to any breach by Defendants of any obligation under the Purchase Agreement.

**Count II**
**Fraud and Fraudulent inducement**

91.     The allegations set forth in this Complaint are repeated and realleged as though fully set forth herein.

92.     To prevail in a claim of fraudulent inducement in Kansas, plaintiff must prove that (1) The defendant made false representations as a statement of existing and material fact; (2) the defendant knew the representations to be false or made them recklessly without knowledge concerning them; (3) the defendant made the representations intentionally for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations; (5) the other party sustained damages by relying upon the representations. *Stechschulte v. Jennings*, 297 Kan. 2, 19, 298 P.3d 1083 (2013)

93.     Defendants falsely represented that Plaintiffs would receive 50% of all Sellers' issued and outstanding equity interest of the Company (the "Units") in exchange for Plaintiffs' investment of $500,000.

94.     Defendants knew the foregoing representation was false and made it intentionally for the purposes of inducing Plaintiffs to invest $500,000 in the Company.

95.     Plaintiffs reasonably relied on Defendants' representations that they were purchasing 50% membership interest in the Company, and thereby suffered damages in an amount to be proven at trial.

**Count III**
**Breach of Fiduciary Duty**

96.     The allegations set forth in this Complaint are repeated and realleged as though fully set forth herein.

177829838

97.     In Kansas, the requirements of a claim of breach of fiduciary duty are (1) the existence of a duty, (2) breach of that duty and (3) damages resulting from the breach. *Schneider v. Kansas Sec. Comm'r*, 54 Kan. App. 2d 122, 397 P.3d 1227 (2017)

98.     As Members holding 50% ownership interest of the Company and unilaterally exercising control over its operations, affairs and finances to the exclusion of Plaintiffs, Defendants had a duty of loyalty, care, and good faith and fair dealing to both the Company and the Members.

99.     Defendants breached their fiduciary duties by, without limitation:

a.   Conducting Company business and taking numerous corporate acts without authorization of a majority of the Members;

b.   Preventing Plaintiffs from accessing Company books and records and concealing material financial information;

c.   Misappropriating and wasting millions of dollars in Company assets;

d.   Incurring debts on behalf of the Company without authorization;

e.   Self-dealing;

f.   Failing to make pro rata distributions to all Members;

g.   Failing to keep proper capital accounts;

h.   Locking Plaintiffs out of the management of the Company and supervision of its finances.

100.    As a result of Defendants' breaches, Plaintiffs have incurred damages in an amount to be proven at trial.

**Count IV**
**Unjust Enrichment**

101.    The allegations set forth in this Complaint are repeated and realleged as though fully set forth herein.

18

102.     To establish an unjust enrichment claim, a plaintiff must establish (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." *Walsh v. Weber*, 379 P.3d 1150 (Kan. Ct. App. 2016).

103.     Pursuant to the Purchase Agreement, Plaintiffs transferred $500,000 to Defendants in exchange for 50% of all Sellers' issued and outstanding equity interest of the Company (the "Units").

104.     Defendants accepted and retained the funds and have subsequently made distributions of Company assets to themselves of at least $2 million and likely substantially more while making no distributions to Plaintiffs.

105.     All such distributions constitute a benefit conferred upon Defendants by Plaintiffs' investment, and Defendants' retention of Plaintiffs' 50% share of the distributions is unjust.

106.     As a result of their wrongful conduct, Defendants were enriched at the expense of Plaintiffs in an amount to be proven at trial.

107.     Plaintiffs request disgorgement of all benefits wrongfully obtained by Defendants.

**Count V**
**Conversion**

108.     Plaintiffs repeat and re-allege the allegations above as set forth herein.

109.     To prevail in a conversion claim in Kansas, a Plaintiff is required to show that Defendant (1) assumed or exercised the right of ownership (2) over Plaintiff's property (3) without authorization, and (4) to the exclusion of Plaintiff's rights. Lucas v. S. Meridian Park, LLC, 294 P.3d 362 (Kan. Ct. App. 2013)

110.     By taking unauthorized distributions, disbursements, and "member draws" from the Company, using Company funds to make payments beyond those reasonably required in the

19

ordinary course of business, and excluding Plaintiffs from their rightful interest in the Company, Defendants have assumed or exercised ownership over Plaintiffs' property, without authorization and to the exclusion of Plaintiffs' rights.

111.    As a result, Plaintiffs have incurred damages in an amount to be proven at trial.

112.    Plaintiffs request disgorgement of all property wrongfully obtained by Defendants.

**Count VI**
**Orders of Judicial Dissolution and Accounting**

113.    Plaintiffs repeat and re-allege the allegations above as set forth herein.

114.    Plaintiffs own in the aggregate 50% of the outstanding interests in the Company.

115.    As set forth in the paragraphs above, Plaintiffs have attempted to call a Meeting of the Members or otherwise resolve Company business for which a majority of the Membership Interest in the Company is required and Defendants have uniformly refused.

116.    Given the repeated refusal and failure of Defendants to attend Meetings of the Members or otherwise participate in the proper management of the Company, the Company is suffering, or is threatened with, irreparable injury because the members of the Company are so deadlocked respecting the management of the affairs of the Company that the requisite vote for action cannot be obtained and the members are unable to terminate such deadlock.

117.    Therefore, pursuant to K.S.A. § 17-76,117(b), Plaintiffs request judicial dissolution of the Company and disposition of its assets pro rata on the basis of the complete and accurate capital accounts of the Members.

118.    Plaintiffs further request an order of immediate turnover of all books and records of the Company for inspection by Defendants and their accountants and counsel and an accounting for the purposes of judicial dissolution.

177829838

**WHEREFORE**, Plaintiffs pray judgment be rendered against Defendants as follows:

(a)     Awarding such damages as Plaintiffs can prove, with pre-judgment interest at the applicable statutory rate;

(b)     Awarding all costs incurred by Plaintiffs in connection with this suit, including reasonable attorneys' fees and expenses;

(c)     Ordering the disgorgement of sums wrongfully obtained by Defendants as set forth herein;

(c)     Ordering an accounting of the Company as set forth herein;

(d)     Ordering judicial dissolution of the Company as set forth herein; and

(e)     Awarding such other and additional relief as this Court may deem just and equitable.

### Designation of Place of Trial

Plaintiffs designate Kansas City, Kansas as the place of trial.

### Demand for Jury Trial

Plaintiffs hereby demand trial by jury of all issues so triable.

Dated:  October 21, 2022

> */s/ Brian E. Sobczyk*
> Brian E. Sobczyk, KS #21046
> **Stinson LLP**
> 1201 Walnut Street, Suite 2900
> Kansas City, MO 64106
> Telephone: 816.842.8600
> brian.sobczyk@stinson.com
>
> Barry Lax (*pro hac motion to be filed*)
> Robert Miller (*pro hac motion to be filed*)
> **Lax Neville Attorneys at Law**
> 350 Fifth Avenue, Suite 4640
> New York, NY 10118
> Telephone: 212.696.1999

177829838

blax@laxneville.com
rmiller@laxneville.com

*Attorneys for Plaintiffs*

177829838